**In re EASTERN TRANSP. CO.**

Bankr. No. 10218.

United States District Court
D. Maryland.

Jan. 10, 1952.

Supplemental Opinion

March 11, 1952.

Frederick J. Green, Jr., Asst. U. S. Atty., Allen A. Davis, Asst. City Solicitor, of Baltimore, Md., for the United States and others.

Robert H. Williams, Jr., of Baltimore, Md., for Trustee.

COLEMAN, Chief Judge.

This matter is before the court to review an order of the Referee in Bankruptcy authorizing the trustee of the Eastern Transportation Company, bankrupt, to abandon four obsolete, worthless wooden barges moored at their present location in so-called "dead" anchorage No. 8, Curtis Bay,

Baltimore Harbor where there is a depth at mean low water of some 23 feet.

The Baltimore District Engineer, United States Corps of Engineers, and the Mayor and City Council of Baltimore opposed the passage of this order of the Referee and have petitioned for a review, claiming that the abandonment of the barges will be in violation of Sections 403, 406, 409 and 411 of Title 33 United States Code Annotated, Section 409 being commonly known as the Wreck Act. Taken together, these sections relate to the obstruction of navigable waters and impose penalties for unauthorized obstructions or failure to remove them, in conformity with these statutory provisions. The Baltimore City authorities also assert that abandonment of the barges will violate Section 36 of Article 11 of the Baltimore City Code, 1950, which imposed the duty upon owners of vessels sunk in Baltimore Harbor to remove them upon direction of the Harbor Engineer, and imposes penalties for failure to do so.

The following is a summary of the more important facts as found by the Referee on the basis of the stipulation filed with the Referee and the testimony heard by him: The Eastern Transportation Company was adjudicated a bankrupt by this court on December 8, 1950. A receiver was appointed for the bankrupt estate pending election of a trustee, which occurred on January 30, 1951. Among the bankrupt's assets were four wooden barges which for some time prior to the bankruptcy were moored at anchorage No. 8 because of obsolescence. One of them has become almost completely submerged. These barges vary as to dimensions and net registered tonnage, but all of them are more than 200 feet in length. The trustee in bankruptcy has attempted through public sale to dispose of these barges, but there has been no purchaser. During the period of custody, both by the receiver and the trustee in bankruptcy, it has been necessary to have the three floating barges frequently pumped in order to prevent their sinking. This pumping has been done at the expense of the bankrupt estate. Also, at night the required lights have been placed on the barges by the receiver and trustee. Pursuant to an order of this court, the barges were appraised in December, 1950, this appraisal giving a value of $500 each to two of the three barges that are still afloat; and to the remaining floating barge a value of $300. The fourth, the submerged barge, has no value. Despite the aforegoing appraisal of the three floating barges, they have no market or usable value, as indicated by the trustee's inability to sell any of them and by their obsolete condition, except as respects the value of some equipment on them. The trustee obtained an estimate of the cost of removing the three floating barges and sinking them in deep water with the approval of the United States Engineers which totaled $6000. The cost of raising the fourth barge and removing and sinking it in deep water, and the cost of similar disposition of any of the other three barges after they might sink, was estimated to be very much greater.

Briefly stated, the position of the trustee is that these barges are not assets of the bankrupt estate but, in fact, are liabilities, namely, wrecks according to maritime law, and that as such may and should be abandoned where they lie at anchorage.

It will thus be seen from the aforegoing that the question before the court is this: May a vessel owner, solely in order to save expense, deliberately abandon and allow to sink, a vessel in navigable waters; or is such right of abandonment limited to vessels that have been accidentally sunk or rendered of no further use, as by storm, fire, collision or unforeseen unseaworthiness?

On the aforegoing facts, the Referee found and issued an order accordingly on November 13, 1951, that these barges were burdensome assets which the trustee, pursuant to the Bankruptcy Act, might abandon and thereby revest title to the barges in the bankrupt, including the transfer of any liability for what might thereafter occur in connection with the barges.

The Referee did not consider the question whether cessation of pumping and permitting the barges to sink, or failure to keep proper lights upon them at night, whether floating or sunk, would be in violation of

any Federal statute. The Referee merely undertook, assuming that such might be violated, to decide the question whether a court of bankruptcy may authorize a trustee of the bankrupt estate to abandon a burdensome asset, when the bankrupt at the time is known to have no current assets. The Referee thus stated his conclusion: "That inasmuch as a court of bankruptcy has the authority to authorize the abandonment of burdensome assets and the title to such assets thereupon revests in the bankrupt as of the date of bankruptcy, upon abandonment of these barges by the trustee he was in the position of never having had title to them, and therefore, was not an 'owner' within the meaning of Title 33. Not being an owner, he had no responsibility to keep the barges afloat or lighted and therefore could not be said to aid, abet, authorize or instigate, within the meaning of Section 411 of Title 33, and that if he did further expend funds of the estate in keeping these barges afloat or lighted, he would be guilty of wasting the assets of the estate."

The answer to the question here presented depends upon the interpretation to be given to Sections 403 and 409 of Title 33 United States Code, relating to navigation and navigable waters. Section 403 prohibits "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States", and provides that "it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; * * *." Section 406 makes violation of Section 403 a misdemeanor, punishable by a fine of not less than $500 nor more than $2500, or by imprisonment not exceeding one year or by both. Section 406 further provides that "the removal of any structures or parts of structures erected in violation of the provisions of the said

sections [including section 403] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States."

It is the contention of counsel for the trustee in bankruptcy that Section 403 and its penalty Section 406 by their language, apply only to wrongful "structures" and are therefore not applicable to vessels such as these barges; in other words, that the intent of Section 403 was the prohibition of structures of a more or less permanent nature unless authorized by law. The trustee relies in support of this position upon United States v. Burns, C.C., 54 F. 351, in which an earlier statute similar to and which was superseded by Section 403, was so construed. We are inclined to agree with the trustee on this point, in spite of the fact that United States v. Hall, 63 F. 472, a decision of the Circuit Court of Appeals for the First Circuit, is in effect, to the contrary. We say "in effect" because that decision interpreted an earlier statute, containing similar language, i. e., Section 10 of the Act of September 19, 1890, 26 Stat. 454, which Section 403 of Title 33, being Section 10 of the Rivers' and Harbors' Appropriation Act of March 1899, 30 Stat. 1151, superseded and repealed at least with respect to "creation" of obstructions. See United States v. Wishkah Boom Co., 9 Cir., 136 F. 42.

The Hall case involved a schooner that had caught fire at sea and had been brought into harbor, where the fire was put out. Thereafter, the owners decided to scuttle the schooner at her anchorage in order to save the rigging and spars, and abandon her to the underwriters. She was condemned and sold to defendant Hall who stripped and abandoned her where she was scuttled. Thereupon the United States brought a bill under Sections 403 and 406 to compel defendant Hall to remove the hull on the ground that it was obstructing navigation. The court granted the relief sought by the Government and in the course of its opinion said, 63 F. 474-475: "It is also apparent that the act was voluntary and delib-

erate, and it is quite immaterial whether, as contended by the plaintiff, the purpose was to turn her over to the government, and cast the burden of removal thereon, or, as conceded by the defense, to abandon her to the underwriters.

"Some obligation rests upon the government to keep the harbors clear for public use, and the obligation rests upon each individual member of the public, exercising the right of navigation, to have reasonable regard for public rights, as well as the common and equal rights of others having occasion to use the public waters. In other words, he must not act with reference to his own pecuniary advantage alone. While members of the public may use the harbor as a place of refuge and greater safety for the vessel and cargo in case of necessity and distress, they may not, under the circumstances disclosed by the record in this case, use it as a scuttling place for the hull, that the rigging may be saved. As has been said, such is not a right incident to the right of navigation; and if, under such circumstances, the owner sees fit to scuttle his vessel, that the wreck may be stripped, he is bound to remove the obstruction, which, for his own slight pecuniary advantage, he voluntarily creates.

"In our view, section 10 of the act of September 19, 1890, was intended to apply to all obstructions of a permanent character not affirmatively authorized by law, willfully, wantonly, carelessly, or voluntarily created in the navigable waters, over which the United States has jurisdiction, not covered by the specific provisions of the preceding sections in the same chapter; and it follows from this construction that hulls of vessels sunk in harbors not through perils of the sea, but by voluntary act of owners or their authorized agents, are obstructions, within the meaning of this section of the statute."

In spite of this forceful opinion, we believe, as already stated, that, as the trustee contends, Section 403 was not intended to relate to vessels. Therefore, we are not disposed to adopt the reasoning in the Hall case, particularly in the absence of other decisions to the same effect. We have not been referred to, nor have we found any other such decisions. Nor do we believe it is necessary to rest our decision upon Section 403 because, in our opinion, Section 409 by its language clearly covers the present situation and constitutes a prohibition against abandoning these barges in the manner which the Referee has authorized.

Section 409 declares "It shall not be lawful * * * to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; * *." This Section further provides that "whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for." Section 411 makes violation of Section 409 a misdemeanor and provides penalties similar to those provided by section 406 for violations of Section 403.

Counsel for the Government contends that, properly construed, Section 409 does not, nor does the general maritime law give the right to abandon floating or intentionally sunk vessels, but is limited to vessels which have been "wrecked and sunk in a navigable channel, accidentally or otherwise"; that is to say, where the sinking has been due to causes distinct from *voluntary* sinking as it is proposed to accomplish in the case of these barges. Assuming that the trustee abandons the barges, withdraws their watchman and discontinues the pumping of them as it is proposed to do, and the barges sink, it cannot be said that the trustee did not "voluntarily or carelessly sink or permit or cause to be sunk" these three barges. It is conceded by all parties to this controversy that

the use of the term "navigable channels" in Section 409 and other related statutes embraces anchorage areas such as the one where these barges are lying.

Counsel for the trustee in bankruptcy contends that since Section 409 relates to vessels "wrecked and sunk in a navigable channel, accidentally or otherwise"; and since it provides that such craft may be "abandoned", if they are marked so as not to be a menace to navigation, either day or night, it follows that this Section clearly recognizes the right of abandonment.

While admittedly the phraseology of Section 409 is somewhat clumsy, we believe the construction that counsel for the trustee in bankruptcy would have us place upon it is not justified, and was never intended to be given to it. It is to be noted that the *abandonment* referred to in the statute relates specifically to vessels that are "wrecked and sunk in a navigable channel, accidentally or otherwise * * *." It is further to be noted that the type of *sinking* that is made unlawful in the first part of the statute is the "voluntarily or carelessly" sinking. Thus, it would be a contradiction to say that Section 409, although first prohibiting *voluntary or careless sinking of vessels* in a navigable channel, nevertheless permits this to be done since the latter part of the statute permits *abandonment* of vessels if *"wrecked and sunk in a navigable channel, accidentally or otherwise"*. (Emphasis supplied.)

In other words, we are satisfied that Section 409, when properly construed, permits abandonment of a vessel only as a result of such things as fire, storm, collision or unforeseen unseaworthiness, and that if abandonment results under such circumstances the craft becomes subject to removal by the Government pursuant to Section 414, but that it is only under such conditions that a vessel owner can absolve himself from the burden of seeing that his vessel does not become, by abandonment, a menace to navigation. Were this not true, vessel owners might indiscriminately, and merely upon the basis of escaping some financial outlay, abandon vessels of all types wherever, according to their fancy, they might prefer to junk them, so to speak, as they become obsolete or worthless. It is true that Section 414, supplementing Section 409, specifically provides for the removal by and at the expense of the Government of sunken vessels which, for a specified period of time, are obstructing or endangering navigation, including those which have been *abandoned*. But we do not find that there is anything in Section 414 which controverts our interpretation as just given of the meaning of Section 409. Also, the Government is given by Section 415 the right of summary removal or destruction of craft that is seriously interfering with or specially endangering navigation, and the expense of such removal or destruction is made a charge against the craft and cargo so removed or destroyed.

We believe that our conclusion is amply supported by the cases upon which counsel for the Government relies such as Petition of Highlands Navigation Corporation, 29 F.2d 37, a decision of the Second Circuit Court of Appeals. In this case the vessels involved were destroyed by fire not shown to have been caused by any fault on the part of the owner or those in direct charge of the vessels. The right to abandon them, after giving the Government the requisite notice, was recognized under Sections 409, 414 and 415 of Title 33. To the same effect are The Manhattan, 10 F. Supp. 45, affirmed 3 Cir., 85 F.2d 427, 429; and Thames Towboat Co. v. Fields, D.C., 287 F. 154. None of the cases relied upon by counsel for the trustee embraces facts of intentional sinking such as is proposed in the present case. It is true that we have been referred to no decision where Section 409 has been applied to facts akin to those now before us, but this does not alter our belief that the interpretation which we have given to this Section is correct in relation to the present facts.

As already explained, the Referee in Bankruptcy based his conclusion entirely upon what he understood to be the trustee's right under the Bankruptcy Act, i. e., that the trustee's right to divest the bankrupt estate of burdensome assets was paramount to any other statutory provision

and apparently, therefore, the Referee did not deem it necessary to analyze the Federal statutes relating to navigable waters. In this we think he was in error. The Referee appears to have been influenced also to a large extent by the fact that, on the evidence as presented to him, the trustee in bankruptcy had not acquired any assets since the date of adjudication, and was believed to be unable to pay for the expense of moving the barges or otherwise disposing of them, while counsel for the trustee, in the course of argument before this court, admitted that this was not entirely accurate, because the estate had at least some potential assets even though no funds were currently at hand. We do not think, however, that the existence or non-existence of funds with which to meet the trustee's obligation is really material to the basic question before us. Concluding as we do, that the trustee has no right to abandon these barges in their present location, for the reason and in the manner proposed, because this will result in a menace to navigation, without being liable to the penalties for so doing provided by Section 411, the provisions of the Bankruptcy Act give to the trustee under this Section no immunity, and no greater rights than would be possessed by the ordinary solvent shipowner acting under like circumstances.

In view of our conclusion, it becomes unnecessary to consider the application of Section 36 of Article 11 of the Baltimore City Code, 1950, to the present situation upon which the Mayor and City Council of Baltimore also rely. The Federal Statute, for the reasons herein stated, must be considered as dominant and conclusive of the case.

An order will be signed, in accordance with this opinion, rescinding the order of the Referee and requiring the trustee in bankruptcy forthwith to arrange for, and to cause the removal of all four barges from their present location, under the direction of the United States District Engineer and the Baltimore City Harbor Engineer, the cost of same and the costs of this proceeding, to be borne by the bankrupt estate.

## Suppplemental Opinion.

■ Following the rendition of this court's original opinion, the trustee in bankruptcy petitioned the court to reopen the proceeding for the purpose of hearing newly discovered evidence to the effect that the sole cause of the sinking of one of the barges, which lies almost completely submerged, was a storm which occurred prior to commencement of the bankruptcy proceedings; and that following the storm, but before the bankruptcy proceedings had begun, the Eastern Transportation Company, owner of the barge, had abandoned it.

The trustee's petition was granted, and the court, finds, on the new evidence, that the facts were as the trustee claimed with respect to this barge, and that the trustee had a right to treat it as never having become part of the bankrupt's estate, for the reason that it had already been lawfully abandoned by his predecessor in title, namely, the Eastern Transportation Company, before becoming bankrupt, and therefore before the trustee could take title to it. The right of the Company to abandon this particular barge existed under Section 409 of Title 33 U.S.C.A. because its sinking was entirely unintentional and caused by the storm, and the Company, its owner, having abandoned it, the obligation to remove the barge shifted, pursuant to the provisions of Section 414, from the Company to the Government.

■ The court further holds that both the trustee's predecessor in title and the trustee himself being thus exempt by federal statute from the requirement to remove the sunken barge, the Baltimore ordinance (Section 36 of Article 11 of the Baltimore City Code, 1950) which imposes a duty upon owners of vessels sunk in Baltimore Harbor to remove them upon direction of the Harbor Engineer, with penalty for failure to do so, is nonenforceable in the present instance, because otherwise the federal exemption which is dominant would be nullified. See Petition of Highlands Navigation Corporation, 2 Cir., 29 F.2d 37; The South Shore, 35 F.2d 110, 1929 A.M.C. 1552.

Accordingly, this court's original order will be modified to conform with this supplemental opinion.